<u>**NOT FOR PUBLICATION**</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| HOUSEMASTER SPV LLC,<br><br>               Plaintiff,<br><br>          v.<br><br>JOHN T. BURKE, JR.,<br>               Defendant. | Civil Action No. 21-13411 (MAS) (TJB)<br><br>**MEMORANDUM OPINION** |

<u>**SHIPP, District Judge**</u>

This matter comes before the Court on Plaintiff HouseMaster SPV LLC's ("HouseMaster") Motion for a Preliminary Injunction against Defendant John T. Burke, Jr. ("John"). (ECF No. 2.) With the benefit of limited discovery, John opposed HouseMaster's Motion (ECF No. 66), and HouseMaster replied (ECF No. 68). The Court has carefully considered the parties' submissions and decides the matter without oral argument under Local Civil Rule 78.1. For the reasons below, the Court grants HouseMaster's Motion.

## I.    <u>BACKGROUND</u>

This case is about a home inspection franchise and, specifically, what happens when an individual franchisee operates a competing business after terminating his franchise agreement. The franchise at the center of this story is HouseMaster, a home and building inspection business started in 1979 that manages 370 franchised businesses throughout the United States. (Pl.'s Moving Br. 1, ECF No. 2-2.) HouseMaster operates in New Jersey where it provides support and training to franchisees across the country. (McCormick Reply Decl. ¶ 58, ECF No. 68.) The company

contends that it established goodwill over the years by generating brand recognition and a loyal customer base. (McCormick Decl. ¶ 5, ECF No. 2-3.) In appealing to potential franchisee owners, HouseMaster promises, among other things, its name recognition as well as its business model and methodology, making available to prospective owners (i) proprietary report templates and guides, as well as legal templates; (ii) customer platforms, tools, and reports; (iii) repair list generators and repair estimator reports; (iv) inspection guides and step-by-step explanations; (v) internal repository of documents, manuals, and newsletters; and (vi) "specialized marketing tactics." (*Id.* ¶ 7.) HouseMaster contends that it spent considerable capital creating its proprietary materials to assist prospective franchisee owners and spares them the risks and costs associated with starting a new business. (*Id.* ¶¶ 5, 8.)

This story begins in 2003, when John and his then-wife Jacqueline Burke ("Jacqueline") met a HouseMaster representative while living in New Jersey. (Burke Dep. Tr. 15:22-25, ECF No. 70-1.) After that meeting, Jacqueline opened a new HouseMaster home inspection franchise in Virginia Beach, Virginia. (McCormick Decl. ¶ 9.) Jacqueline entered into a comprehensive franchise agreement with HouseMaster for a five-year term. (*Id.*) Shortly after Jacqueline opened shop, John, who had no prior experience as a home inspector, "began operating as a HouseMaster franchise" when he took over Jacqueline's business. (Aff. of John Burke ¶ 3, ECF No. 66-1; Burke Dep. Tr. 18:2-5.) John operated as a "one-man shop" in the early years of operating the franchise, and attended third-party training programs as part of HouseMaster's onboarding process. (Burke Dep. Tr. 66:4-22.) Much to his chagrin, John utilized HouseMaster's forms and marketing materials, which he personally believed were ineffective. (*Id.* at 67:20-25, 68:2-22.) The company also provided John with forms and software programs to use for home inspections. (Burke Dep.

Tr. 67:20-25, 68:1-25, 69:1-12.) But according to John, he never read any of HouseMaster's marketing or operation manuals. (*Id.* at 88:4-8, 89:9-18.)

Grievances notwithstanding, in 2008 John entered into a subsequent franchise agreement with HouseMaster that granted him an expanded and exclusive territory: John now managed various sections of Virginia near Chesapeake, Norfolk, and Virginia Beach. (McCormick Decl. ¶ 1; Burke Dep. Tr. 73:13-25.) He entered into the agreement voluntarily; that is, he had no legal obligation to sign a subsequent agreement. (Burke Dep. Tr. 75:5-13.) John maintained the right to use HouseMaster's trademarks, service marks, and internal systems for another five-year term. (McCormick Decl. ¶¶ 10-11.) John went on to extend his franchise agreement in 2014 (Burke Dep. Tr. 76:20-22) and signed a new five-year term in 2016 after negotiating with HouseMaster for additional territories (*Id.* at 78:18-20, 84:3-23). John's executed 2016 franchise agreement (the "Franchise Agreement") with HouseMaster is at issue in this case. (*See* Pl.'s Moving Br., Ex. 2 ("Franchise Agreement"), ECF No. 2-5.) The Franchise Agreement offered tradeoffs; as just one example, HouseMaster spent over six million dollars in nationwide advertising expenses since John started his franchise in 2003 (McCormick Decl. ¶ 3) and, on the other hand, John agreed to restrictive covenants that prohibited him from operating a competing home inspection business within a certain area or taking clients should he separate from HouseMaster, among other restrictions (*see generally* Franchise Agreement).

In late 2015, John "handed everything" related to the operational side of HouseMaster over to his second wife, Michelle Burke ("Michelle" and collectively with John, the "Burkes"), as he minimized his role in the company to "just bec[o]me an inspector." (Burke Dep. Tr. 61:2-9.) Until then, Michelle was a schoolteacher with no prior experience in home inspections. (*Id.* at 61:2-4.) After 2015, Michelle became a salaried employee and handled marketing, payroll, the company's

accounting, and was responsible for hiring inspectors. (*Id.* at 61:2-22, 48:11-23, 58:9-13.) Indeed, according to John, Michelle was invaluable in growing the business and establishing new clients. (*Id.* at 71:21-25, 72:1-9.) After Michelle took over the business, John was not involved in the management of the business. (*E.g.*, *id.* at 112 ("Q: did you pay HouseMaster whatever outstanding royalties and marketing fees were owed? [John] A: I have no idea.").) In 2017, John and Michelle formed a separate entity, Burke Inspection Service, LLC ("Burke Inspection"), for tax purposes and to insulate the Burkes from personal legal liability related to their businesses. (*Id.* at 22:5-25, 26:1-17.) But HouseMaster was "effectively" not run through Burke Inspection because John never assigned the franchise business to his newly formed entity. (*Id.*) Through Burke Inspection, John also operated a second business where he sold and leased holiday decorations and Christmas lights on residential and commercial properties. (*Id.* at 27:1-15.) Although the Burkes attempted to hold Burke Inspection out as a separate entity, the Burkes' management of the HouseMaster and decoration businesses was "a mess," as was the paperwork, with comingling of funds in one bank account. (*Id.* at 24:4-25, 25:1-21.) And until 2021, Burke Inspection was solely owned by John. (*Id.* at 34:4-8.)

This story reached its climax in 2021. John's Franchise Agreement expired in March and, leading up to that date, the Burkes were "trying to figure out how to get out" of their HouseMaster franchise. (Burke Decl. ¶ 22; Burke Dep. Tr. 35:5-10.) In the first several months of 2021, John was inspecting homes in Virginia, where he maintained his HouseMaster business, and in North Carolina, a region outside of his territories. (Burke Dep. Tr. 35:2-25.) As was the case since John started in 2003, he operated his HouseMaster franchise business out of his home. (Michelle Dep. Tr. Rough 36:18-21, ECF No. 68.) What happened next is muddled, to say the least. Burke Inspection, originally a Virginia company, was converted into a North Carolina entity in March

2021. (*Id.* at 56:4-7.) Around the same time, Michelle accessed third-party software, Inspection Support Network ("ISN"), through her HouseMaster account and downloaded a list of referral contacts. (McCormick Reply Decl. ¶ 43, ECF No. 68; Burke Dep. Tr. 170:19-25, 171:13-25, 172:3-25.) John did the same two months later. (*Id.*) Also in March 2021, a busy month for the Burkes, the formal HouseMaster Franchise Agreement expired, and, per the terms of the agreement, the Burkes continued operating their HouseMaster franchise on a month-to-month basis subject to the same terms and conditions as before. (Franchise Agreement § I(C)(9).) Finally, to cap off March, Michelle registered a new company in North Carolina, Beacon Inspection Services LLC ("Beacon") in John's name. (Pl.'s Moving Br. Ex. 7, ECF No. 2-10.)

Beacon's newly registered office, although located in North Carolina, was about three miles from John's former HouseMaster territory. (McCormick Decl. ¶ 32.) Boasting immediate inspection services, Beacon's website promoted that John would "continue to serve" communities in parts of North Carolina and Virginia. (*Id.* ¶ 33 (citing Pl.'s Moving Br., Ex. 8, ECF No. 2-11 (Beacon's website).) And during this time, John continued inspecting homes and "[e]verything else in terms of the operation of the [home inspection] business stayed the same" except for "just the name change." (Michelle Dep. Tr. Rough 27:1-8, 36:22-25.) While launching their new business, the Burkes accessed the home inspection software systems and databases through their HouseMaster credentials on several occasions in May 2021 and John sent e-mail messages with inspection templates to himself and Michelle around that same time. (McCormick Decl. ¶ 41.) The same core group of individuals that centered around John's inspection services—Michelle and

their two inspectors—pivoted from HouseMaster to Burke Inspection and later to Beacon.[1] (Michelle Dep. Tr. Rough 37:9-15; Burke Dep. Tr. 48:5-23.)

A month later, John wrote a letter to HouseMaster's President, Josh McCormick ("McCormick"), formally terminating the HouseMaster franchise business with the representation that it was so the Burkes can move to another state. (Pl.'s Moving Br. Ex. 13, at 1, ECF No. 2-16.) Notwithstanding that John's letter was dated April 28, 2021, HouseMaster claims to have received it in late May 2021. (Pl.'s Reply Br. Ex. 2, ECF No. 68; McCormick Decl. ¶ 30.) The Burkes' transition away from HouseMaster was "a disaster" riddled with the Burkes making "a lot of mistakes." (Burke Dep. Tr. 232:8-25.) For example, at some point around May 2021, Burke Inspection spun off its home inspection services to Beacon but maintained the same bank account entitled "John Burke [d/b/a] HouseMaster." (Michelle Dep. Tr. 20:2-21.) It is undisputed that John continued home inspections during this time, although it is unclear whether John was inspecting under Burke Inspection or Beacon. (McCormick Reply Decl. ¶ 60 ("Based upon the spreadsheets that were produced by [John] in discovery, it appears that since [the] termination of his HouseMaster franchise, [John] has performed over 200 home inspections for the competing company.").) The Burkes maintained their same phone numbers—those formerly associated with John's HouseMaster business card and email signature block—while operating Beacon. (*Id.* ¶ 38 (citing Burke Dep. Tr. 119:1-25, 120:1-25, 121:1-25).) Beacon also advertised on social media that "[b]eginning May 1[,] HouseMaster will become Beacon Property Inspection." (McCormick Decl. ¶ 38.) The Burkes exported a list of realtors from the ISN system using their HouseMaster

---

[1] John's team includes Michelle as Director of Marketing, and inspectors Trevor Woody ("Woody") and Gunnar King ("King"). (*Id.* ¶ 42; Burke Dep. Tr. 48:5-23.) Woody started working with the Burkes as a home inspector around 2017 and King worked with John on the Christmas lights business until late 2020 when he began as an apprentice home inspector. (Burke Dep. Tr. 48:5-23.)

account and sent a mass e-mail message to inform their contacts of the change in business title. (Michelle Dep. Tr. Rough 96:17-25, 97:1-25, 106:6-25.) Going forward, realtors that previously worked with the Burkes for HouseMaster continued to solicit Beacon for inspection services. (Michelle Dep. Tr. Rough 71:13-25, 72:1-5.)

Then, sometime in late May, HouseMaster discovered Beacon's website. (Def.'s Opp'n Br. 22, ECF No. 66; McCormick Dep. Tr. 115:1-12, ECF No. 70-3.) A week later, HouseMaster sent John a cease-and-desist letter to halt all inspection services within 25 miles of his former territory by June 22, 2021, as per the restrictive covenants in the Franchise Agreement. (McCormick Reply Decl. ¶¶ 29-31.) The Burkes did not respond to HouseMaster's correspondence and this suit for a preliminary injunction followed two weeks later. (*Id.* ¶ 32; ECF No. 1.) But in July 2021, Michelle formally established Beacon as a limited liability corporation as the sole member. (Michelle Dep. Tr. 17:15-17.) John also transferred the majority ownership of Burke Inspection to Michelle, retaining only a quarter of the company in his own name. (Burke Dep. Tr. 37:6-25.) Up until July 2021, from what the Court can glean, John was "running the inspection business through Burke Inspection." (*Id.* at 37:22-25.)   During this lawsuit, the Burkes again downloaded realtor lists from ISN in August 2021. (McCormick Reply Decl. ¶ 45.)

HouseMaster contends that John's blatant violations of the noncompete provisions in the Franchise Agreement places the business at risk of further defiance from other franchisees, resulted in the loss of goodwill, confused customers with the change in business title from HouseMaster to Beacon, stole longtime clients of HouseMaster, and prevented HouseMaster from refranchising John's former territory. (*Id.* ¶¶ 46-57; McCormick Decl. ¶ 46; Pl.'s Reply Br. 9.)

The initiation of this lawsuit is not the end of the story. Lawsuit notwithstanding, the Burkes continued to operate inspection services, mostly through Beacon, but also occasionally

through Burke Inspection. (Michelle Dep. Tr. 55:2-25, ECF No. 70-2.) As far as John's former HouseMaster territory, "[f]rom time to time" he performed inspections in that area in late 2021 and early 2022. (Burke Dep. Tr. 134:5-7.) John performed inspections for a mix of Beacon and Burke Inspection until February 2022, a few weeks before he was deposed in this matter, when he verbally told Michelle that he was leaving Beacon. (Michelle Dep. Tr. 44:9-24.) Around this same time, Burke Inspection shed all aspects of its business except for installing Christmas lights. (Burke Dep. Tr. 54:9-21.) And Beacon finally separated itself from John's bank account associated with HouseMaster's name. (Michelle Dep. Tr. 20:14-25, 21:1-5.)

Now before the Court is HouseMaster's motion for a preliminary injunction. (ECF No. 2-2.) The parties engaged in expedited discovery including document productions and depositions of John, Michelle, and McCormick. (*See* ECF No. 13.) HouseMaster seeks enforcement of a paired down iteration of its Franchise Agreement's covenants, including a preclusionary order that John and his agents, employees, spouse, and all others in active concert with him cease from (i) soliciting HouseMaster's customers, (ii) soliciting HouseMaster's employees, (iii) operating a competing business within a radius of 25 miles from John's former territory for 18 months, (iv) working with real estate contacts that John worked with as a HouseMaster franchisee, and (v) using or disclosing HouseMaster's confidential or proprietary information. (Proposed Order, ECF No. 2-1.) Additionally, HouseMaster requests the Court to order the Burkes to forfeit all telephone numbers they utilized as a HouseMaster franchise, per the Franchise Agreement's covenants. (*Id.*)

## II.   **LEGAL STANDARD**

In demonstrating a preliminary injunction is warranted, a plaintiff must establish the following elements: "(1) the plaintiff is likely to succeed on the merits; (2) denying the injunction will result in irreparable harm to the plaintiff; (3) granting the injunction will not result in greater

harm to the defendant; and (4) the injunction is in the public interest." *Watchung Spring Water Co. v. Nestle Waters N. Am. Inc.*, No. 14-04984, 2014 WL 5392065, at *2 (D.N.J. Oct. 23, 2014) (citing *Novartis Consumer Health, Inc. v. Johnson & Johnson–Merck Consumer Pharms. Co.*, 290 F.3d 578, 596 (3d Cir. 2002)). It is settled law that a preliminary injunction is "an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (quoting 11A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 2948, at 129-130 (2d ed. 1995)). Preliminary injunctions are not appropriate remedies to prevent the possibility of some remote future injury. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).

The first two factors, commonly referred to as the "gateway factors," are the "most critical." *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017), *as amended* (June 26, 2017). Only once these gateway factors are met should a court consider the remaining two factors. *Id.* "A plaintiff's failure to establish any element . . . renders a preliminary injunction inappropriate." *Nutrasweet Co. v. VitMar Enters.*, 176 F.3d 151, 153 (3d Cir. 1999).

## III.   DISCUSSION

HouseMaster contends that this Court should enter a preliminary injunction against John because of his clear and unequivocal violations of the Franchise Agreement's provisions. (*See generally* Pl.'s Moving Br.) John counters that HouseMaster (i) cannot prove irreparable harm, as evidenced by HouseMaster's delay in filing suit; (ii) failed to demonstrate that it will suffer greater harm than John, or that the public interest supports granting a preliminary injunction; and (iii) did not bind Michelle or her businesses, like Beacon, into the Franchise Agreement. (*See generally* Def.'s Opp'n Br.) In addition to the contested preliminary injunction motion, the parties disagree about whether New Jersey or Virginia law applies. The Court thus first analyzes the choice-of-law issue and then considers the preliminary injunction motion.

### A.  New Jersey Law Applies

The Franchise Agreement unequivocally states that New Jersey law applies. (Franchise Agreement § XIII(D).) Thus, the Court starts its choice-of-law analysis with the presumption that the parties' choice-of-law agreement controls and New Jersey law applies to any contractual disputes regarding the Franchise Agreement. *Instructional Sys., Inc. v. Comput. Curriculum Corp.*, 614 A.2d 124, 133 (N.J. 1992). Two narrow exceptions exist to rebut this presumption, however; both of which are raised by John:

> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties'[] choice, or (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which . . . would be the state of the applicable law in the absence of an effective choice of law by the parties.

(Pl.'s Opp'n Br. 15 (citing Restatement (Second) of Conflicts of Law, § 187).) As to the first exception, John argues that "the chosen state of New Jersey has literally no relationship to the transaction," as "[t]he franchise was purchased in Virginia, Burke resided in Virginia, [and] the contract was signed in Virginia" where the franchise operated. (*Id.*) In support of the second exception, John contends that Virginia law would apply absent the Franchise Agreement and that Virginia has a greater interest due to its "specific non-compete laws that restrict application of non-competes to low wage employees that meet certain criteria" and Virginia's aversion to the "blue pencil doctrine" for "overly broad non-compete provisions." (*Id.* at 16.)

HouseMaster disagrees, arguing that settled law provides a New Jersey company seeking to enforce its noncompete provisions "is a sufficient basis to establish a substantial relationship to New Jersey." (Pl.'s Reply Br. 6-7, ECF No. 68 (citing *Chemetall US Inc. v. Laflamme*, No. 16-780, 2016 WL 885309 (D.N.J. Mar. 8, 2016)).) Second, HouseMaster contends that New Jersey

has an equal interest in protecting its companies' contractual rights, defeating the second narrow choice-of-law exception. (*Id.* at 7.)

The Court agrees with HouseMaster that New Jersey law controls. *First*, there is no dispute that the Franchise Agreement selects New Jersey law. (Franchise Agreement § XIII(D).) *Second*, HouseMaster is based in New Jersey where it contracts with franchisees across the country. Thus, it can hardly be argued that its legal dispute with a franchisee has no nexus to New Jersey. *Third*, although the Court agrees with John that Virginia has a "material interest in enforcing its strong public policy against non-competition clauses in employment agreements," it also finds "New Jersey . . . has a substantial relationship to this dispute, and 'an interest in enforcing its company's rights, in enforcing covenants that are reasonably designed to protect the legitimate interests of its residents, and in protecting the confidential information of its residents.'" *Diversant, LLC v. Carino*, No. 18-3155, 2018 WL 1610957, at *4 (D.N.J. Apr. 2, 2018) (quoting *Chemetall US Inc.*, 2016 WL 885309, at *6). What's more, John is not a mere employee signing an employment agreement but a franchisee owner signing a franchise agreement. In any event, the Court does not find Virginia to have a "materially greater interest" than New Jersey in settling this dispute. The Franchise Agreement's choice-of-law provision is enforceable and not outweighed by public policy considerations. *See id.* New Jersey law applies.

## B. The Court Issues a Preliminary Injunction

Having determined that New Jersey law applies, the Court next examines whether a preliminary injunction is appropriate in this case. In doing so, HouseMaster must meet a high burden in showing (1) that it has a "reasonable probability of eventual success in the litigation," (2) that it will be irreparably injured absent relief, (3) "the possibility of harm to other interested persons from the grant or denial of the injunction" does not outweigh the harm to the plaintiff, and (4) "the public interest." *Reilly*, 858 F.3d at 176 (quoting *Del. River Port Auth. v. Transamerican*

*Trailer Transport. Inc.*, 501 F.2d 917, 919-20 (3d Cir. 1974)). The Court considers each factor in turn.

### 1.      Likelihood of Success on the Merits

First, the Court considers whether HouseMaster will likely prevail on the merits of its breach of contract claim. *Reilly*, 858 F.3d at 176. Before reaching this question, however, HouseMaster must establish that the covenants are valid and enforceable under New Jersey law.

### a.   The Franchise Agreement's Covenants Are Enforceable

The Court's first stop in journeying through the preliminary injunction inquiry is determining whether HouseMaster has sufficiently shown that the Franchise Agreement's covenants are valid and enforceable. To be sure, the Court already rejected John's argument that, under Virginia law, the noncompete covenants at issue here are overly broad and should be voided. (*See* Def.'s Opp'n Br. at 14-16.) As detailed above, the Court applies the Franchise Agreement's valid choice-of-law provision. (Franchise Agreement § XIII(D).) In applying New Jersey law, noncompete covenants in franchise agreements are often viewed like "agreements ancillary to the sale of a business" in that the franchisee is "in a more equitable bargaining situation than the typical employer-employee relationship." *Jiffy Lube Int'l v. Weiss Bros., Inc.*, 834 F. Supp. 683, 691 (D.N.J. 1993). Courts therefore are more likely to find the covenants reasonable and valid. *Id.* (predicting New Jersey courts would "rule that covenants not to compete in franchise agreements are closer to agreements ancillary to the sale of a business"). In part, the differentiation is that "the primary characteristic of a franchise is the license given to the franchisee to trade upon and exploit the franchisor's good will." *Id.* (citing *Liberty Sales Assoc., Inc. v. Dow Corning Corp.*, 816 F. Supp. 1004, 1010 (D.N.J. 1993)).

With the stage set, the Court finds that the Franchise Agreement's restrictive covenants are at least partially enforceable. After all, John signed the Franchise Agreement, operated the

franchise business for nearly two decades, and raises no arguments that he was fraudulently induced into executing the agreement. And, unlike Virginia law, New Jersey law allows courts to "blue pencil" overly burdensome restrictions by modifying them rather than voiding them altogether. (*Compare Solari Indus., Inc. v. Malady*, 264 A.2d 53, 61 (N.J. 1970) (adopting blue pencil doctrine), *with Lanmark Tech., Inc. v. Canales*, 454 F. Supp. 2d 524, 529 (E.D. Va. 2006) (striking noncompete provisions)). At this stage, therefore, the Court is satisfied that the covenants are not void.

### b.   HouseMaster is Likely to Succeed on the Merits

Next, HouseMaster must demonstrate that it is likely to prevail on the merits. Under New Jersey law, HouseMaster will need to prove (1) "the parties entered into a contract containing certain terms"; (2) "plaintiffs did what the contract required them to do"; (3) "defendants did not do what the contract required them to do, defined as a breach of the contract"; and (4) "defendants' breach, or failure to do what the contract required, caused a loss to the plaintiffs." *Goldfarb v. Solimine*, 245 A.3d 570, 577 (N.J. 2021) (internal quotations and citation omitted). Confident of its odds on the merits, HouseMaster emphasizes John's flagrant (and for the most part, conceded) breach of the Franchise Agreement by offering home inspections near his prior Virginia territory. (Pl.'s Moving Br. 17 (citing *Jackson Hewitt Inc. v. Cline*, No. 14-6931, 2015 WL 6687545, at *3 (D.N.J. Oct. 29, 2015)).) Indeed, based on the limited discovery, HouseMaster represents that spreadsheets turned over by John reveal that he completed over 200 home inspections since terminating the Franchise Agreement, many of which "were in and around his former HouseMaster territory." (McCormick Reply Decl. ¶ 60.) HouseMaster need only show "reasonable probability that it will prevail on the merits," not certainty. *Oburn v. Shapp*, 521 F.2d 142, 148 (3d Cir. 1975).

The Court finds HouseMaster accomplished the requisite showing. That is, it provided sufficient proof that John breached the covenants within the Franchise Agreement by continuing

to perform home inspections within 25 miles of his former territory, emailing the company's contact lists and other forms to himself and Michelle after terminating his franchise, utilizing the same realtors in his old territory, and failing to turn over the phone numbers associated with his HouseMaster business. (*E.g.*, McCormick Reply Decl. ¶ 61 (discovery revealed that Beacon and Burke Inspection used HouseMaster real estate referral contacts in "excess of 60% of their inspections from May 12, 2021 through December 31, 2021").) Notably, John concedes that he inspected homes near his former territory "from time to time" and only quit Beacon, an unequivocal competitor to HouseMaster operating partially in Virginia, in February 2022. (Burke Dep. Tr. 134:5-7.) For the purposes of a preliminary injunction, the analysis of the merits prong ends there. But to be sure, John offers merely a cursory rebuttal that "[he] is not in breach of [the Franchise Agreement] and therefore there is nothing for this [C]ourt to enjoin." (Def.'s Opp'n Br. 16.) The Court finds HouseMaster prevails in showing a likelihood of success.

### 2.   HouseMaster Will Suffer Irreparable Harm Absent an Injunction

Next, and at the epicenter of this Motion, HouseMaster must demonstrate that it will suffer irreparable harm if the Court denies its request for an injunction. Simply put, this prong weighs whether monetary damages are inadequate and a substantial injury to the moving party persists. *Wetter v. Caesars World, Inc.*, 541 F. Supp. 68, 74 (D.N.J. 1982) (quoting, among others, *Judice's Sunshine Pontiac, Inc. v. General Motors Corp.*, 418 F. Supp. 1212, 1218 (D.N.J. 1976)). The proffered "injury must constitute 'potential harm which cannot be redressed by a legal or an equitable remedy following a trial,'" and a "preliminary injunction 'must be the only way of protecting the plaintiff from harm.'" *Ecosave Automation, Inc. v. Del. Valley Automation, LLC*, 540 F. Supp. 3d 491, 500 (E.D. Pa. 2021) (quoting *Acierno v. New Castle Cnty.*, 40 F.3d 645, 653 (3d Cir. 1994); *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989)). The risk of harm must be imminent, concrete, and "poised to occur before the [d]istrict [c]ourt can

hold a trial on the merits." *Id.* (citing, among others, *Hohe v. Casey*, 868 F.2d 69, 72 (3d Cir. 1989)).

In support of this showing, HouseMaster highlights the following forms of irreparable harm: (1) the Burkes advertised that HouseMaster was "becoming" Beacon while maintaining the same inspectors and services, misappropriating the company's goodwill and causing customer confusion; (2) the Burkes are soliciting former HouseMaster customers within 25 miles of their old territory, while working with their former HouseMaster real estate contacts; (3) the Burkes kept the same phone numbers they used in conducting HouseMaster's business, causing further customer confusion; (4) HouseMaster needs to protect its goodwill nationwide and in the Virginia market, (5) the Burkes are continuing to use HouseMaster's proprietary information, including information accessed by the Burkes post termination; (6) HouseMaster is unable to launch a replacement franchise in John's former territory while he competes for business; (7) the Burkes' flagrant disregard for the Franchise Agreement threatens to topple the entire business model if other franchisees follow suit; and (8) John is directly taking business, evident through the nearly 200 inspections he performed post-departure, many of which occurred in his old territory. (McCormick Decl. ¶¶ 47-53; McCormick Reply Decl. ¶¶ 48-57.)

John, on the other hand, puts forward three theories to rebut irreparable harm. First, he contends that, currently, he is no longer violating any of the Franchise Agreement's covenants and injunctions should only grant prospective relief, not remedy past wrongs. (Pl.'s Opp'n Br. 17-18.) Second, John emphasizes that much of the information he obtained from HouseMaster, such as clients and business contacts, are not proprietary materials the company can protect. (*Id.* at 19-22.) Third, John argues that HouseMaster simply failed to demonstrate irreparable harm sufficient to

warrant an injunction, as all its purported damages can be remedied through monetary compensation. (*Id.* at 22-28.)

The Court finds HouseMaster demonstrated sufficient irreparable harm. To begin, it is uncontested that John continued performing inspections in and near his old territory for nearly a year after terminating the Franchise Agreement. HouseMaster remains unable to refranchise John's old territory, which is likely the consequence of a former franchisee continuing to operate the same business in the same former territory with the same client contacts under a different name. (McCormick Reply Decl. ¶ 3-4.) That is, John's former territory remains unattractive to a prospective franchisee owner who may reasonably fear competing with Beacon, a company that is not required to pay franchise fees, that possesses HouseMaster's documents, and whose personnel served the area for decades. (*See id.*) Worse yet, the Burkes advertised that HouseMaster was transforming into Beacon, creating a concrete risk that customers could be confused as to whether the franchise was rebranding, or Beacon was associated with HouseMaster. Repeat customers that call John or Michelle attempting to contact HouseMaster now reach Beacon, further depriving HouseMaster of its goodwill. In addition, the Burkes accessed home inspector templates, customer lists, and other materials using their HouseMaster credentials after terminating the franchise. Collectively, the Burkes' actions deteriorate HouseMaster's goodwill, divert customers to Beacon, cause customer confusion, and hinder HouseMaster's ability to refranchise John's prior territory. All of which, to be sure, cannot be fully remedied through monetary compensation. Absent an injunction, HouseMaster will continue to suffer harm.

The Court is unpersuaded by John's arguments to the contrary. First, his contention that he stopped all violations of the Franchise Agreement is flawed for several reasons. For one, John only stopped violating the Franchise Agreement two weeks before being deposed in this matter and

several months after HouseMaster initiated suit. (Michelle Dep. Tr. 44:9-24.) Moreover, John merely verbally told Michelle he was leaving Beacon. (*Id.*) But until then, "from time to time" John would return from his new area in the Outer Banks to perform inspections for Beacon. (Burke Dep. Tr. 134:5-7.) There are no reassurances that John will stop inspections for Beacon or Burke Inspection or any new inspection business within the restricted area. Moreover, John misses the mark by focusing solely on potential harm *he* caused to HouseMaster. Equally harmful is Michelle's transformation of the Burkes' HouseMaster franchise into a competing home inspection business overnight. (*E.g.*, McCormick Decl. ¶ 38 (advertisement that "HouseMaster will become Beacon" with the "[s]ame great inspectors/same great customer service").) To date, the rebranded inspection business operated by Michelle undermines HouseMaster's ability to refranchise the area and conduct inspections in southern Virginia. Additionally, Michelle also downloaded information from ISN using HouseMaster's credentials, making her mere bystander claim dubious.

Next, the Court is equally unpersuaded by John's argument that none of the information or documentation he obtained from HouseMaster is proprietary. No dispute exists that the Burkes accessed and emailed themselves copies of HouseMaster's templates and contact lists. (*But see* Franchise Agreement § VII(A) (HouseMaster's "Method and Marketing Strategy . . . constitutes trade secrets, confidential and proprietary business information of Franchisor . . . includ[ing] . . . customer information and data, proprietary contact management software, [and] contact or service provider information or data").). If this information was publicly accessible and easily obtained, the Burkes had no need to access HouseMaster's systems after terminating the Franchise Agreement. Yet they did so several times between May and August 2021. In addition, from what the Court gathers, many of the real estate contacts HouseMaster accuses the Burkes of

misappropriating operate within 25 miles of his former territory. In any event, the Court finds the Burkes' access of HouseMaster's systems and information a violation of the Franchise Agreement.

Last, John contends that HouseMaster failed to demonstrate irreparable harm that could not be remedied through monetary compensation. For the reasons detailed above, the Court disagrees.

### 3.       Balancing the Hardships

Having found that the two gateway factors support a preliminary injunction, the Court next considers the parties' competing claims of hardship. "In deciding whether injunctive relief is appropriate, the third task a trial court must undertake is to balance the hardships to the respective parties." *Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 197 (3d Cir. 1990). But in evaluating hardship, the Court must consider that the "harm which follows a defendant who willfully breaches a contractual undertaking is not a basis for denying" a preliminary injunction. *Jiffy Lube*, 834 F. Supp. 2d at 693. Here, it was foreseeable that John's breach of the noncompete provisions in his Franchise Agreement could result in an injunction against him. *Opticians Ass'n of Am.*, 920 F.2d at 197 (finding that defendant can "hardly claim to be harmed, since it brought any and all difficulties occasioned by the issuance of an injunction on itself").

In any event, in "balanc[ing] the competing claims of injury and . . . consider[ing] the effect on each party of the granting or withholding of the requested relief," the Court finds this factor weighs in favor of HouseMaster. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Starting with examining potential hardship to John, this is not a case where an injunction would prohibit him from making a living; indeed, he claims to have already stopped performing home inspections within 25 miles of his former territory, a modest restriction on his ability to work. John now operates a new inspection business in the Outer Banks, where he can operate outside of his

former territory. So, enforcing the injunction should not cause John to suffer any additional expenses in moving his business or prevent him from working.

Conversely, HouseMaster will likely remain unable to successfully refranchise John's former region absent an injunction, causing considerable hardship to the company. Moreover, the HouseMaster franchise continues to suffer injury to its goodwill while it loses repeat customers in southern Virginia. *North Am. Prods. Corp. v. Moore*, 196 F. Supp. 2d 1217, 1231 (M.D. Fla. 2002) (concluding that the balance of hardships favored plaintiff-employer where former employee's active solicitation of customers interfered with plaintiff's relationships with its established customers). John admitted to occasionally performing inspections throughout his former region and receiving business from prior real estate contacts he worked with as a HouseMaster franchisee. *JAK Prods., Inc. v. Wiza*, 986 F.2d 1080, 1085 (7th Cir. 1993) (balancing the hardships in favor of the employer-plaintiff who sought preliminary injunction to protect customers from solicitation by former employee-defendant). For all the above reasons, the Court finds this factor weighs in favor of a preliminary injunction.

### 4.  Public Interest

Last, the Court examines the implications of an injunction and considers what best furthers the public interest. *Opticians Ass'n of Am.*, 920 F.2d at 197. Typically, courts that find in favor of a preliminary injunction on the first three factors will find an injunction is also in furtherance of the public interest. *Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1427 n.8 (3d Cir. 1994) (citing *Duraco Prods., Inc. v. Joy Plastic Enter., Ltd.*, 40 F.3d 1431, 1438 (3d Cir. 1994)). Relevant here, there is public interest in preventing deception or confusion in the marketplace. *SK & F, Co. v. Premo Pharm. Labs.*, 625 F.2d 1055, 1057 (3d Cir. 1980) ("[P]reventing deception of the public is itself in the public interest."). In addition, the "[p]ublic interest is served by enforcing legitimate and reasonable non-solicitation clauses." *Menasha*

*Packaging Co., LLC v. Pratt Indus., Inc.*, No. 17-0075, 2017 WL 639634, at *11 (D.N.J. Feb. 15, 2017); *see also Providence Title Co. v. Truly Title, Inc.*, 547 F. Supp. 3d 585, 606 (E.D. Tex. 2021) ("Enforcing contracts serves the public interest."); *Nat'l Reprographics, Inc. v. Strom*, 621 F. Supp. 2d 204, 229 (D.N.J. 2009) ("[T]he public has a great interest in upholding and enforcing freely negotiated contracts entered into between employees and their employers"). Unlike traditional employer-employee noncompete covenants, under New Jersey law, covenants "not to compete in franchise agreements are closer to agreements ancillary to the sale of a business . . . [as] [t]he franchisee and franchisor are in a more equitable bargaining situation." *Jiffy Lube Int'l*, 834 F. Supp. at 691. Thus, this is not a case where the public interest lies in protecting low-level employees with no real bargaining power.

### C.  Scope of Injunction

The Court determines that HouseMaster has demonstrated a preliminary injunction is warranted and moves next to the scope of the injunction. *Jiffy Lube Int'l*, 834 F. Supp. at 692 (New Jersey law allows courts to "blue pencil" the covenants to ensure they are reasonable). John urges the Court to limit any injunction to just him, as Michelle and her businesses are not subject to the Franchise Agreement or any of its restrictive covenants. Indeed, John argues that HouseMaster seeks too broad an injunction by restricting his spouse and affiliates. (Def.'s Opp'n Br. 28-34.) HouseMaster counters that under Rule 65, any preliminary injunction should enjoin John and all those acting in concert with him, including Michelle, Woody, and King. (Pl.'s Reply Br. 11-12.)

As a preliminary matter, the Court agrees with HouseMaster that any enforcement of the Franchise Agreement would encompass those working in concert with or on behalf of John. To be sure, the Court has the authority to enjoin individuals that were not direct signatories to the Franchise Agreement. *See* Fed. R. Civ. P. 65(d)(2)(B), (C) ("The order binds only the following who receive actual notice of it by personal service or otherwise . . . (B) the parties' officers, agents,

servants, employees, and attorneys; and (C) other persons who are in active concert or participation."). After all, absent an ability to enforce the covenant against John's affiliates, the contractual restrictions would be rendered toothless as John could simply direct others to operate an infringing business on his behalf. *Marshak v. Treadwell*, 595 F.3d 478, 486-87 (3d Cir. 2009) ("Without such an exception, defendants might 'nullify a decree by carrying out prohibited acts through aiders and abettors, although they were not parties to the original proceeding.'" (quoting *Regal Knitwear Co. v. N.L.R.B.*, 324 U.S. 9, 14, (1945)).

Here, as detailed above, Michelle, Woody, and King played a substantial role in John's HouseMaster business. Michelle operated nearly all aspects of the company for six years before the Burkes decided to part ways with HouseMaster. (Burke Dep. Tr. 61:2-9.) And both Woody and King performed inspections for HouseMaster before the Burkes converted it to Burke Inspection and later Beacon. (Burke Dep. Tr. 48:5-23.) The group worked in concert to further John's HouseMaster franchise both before and after terminating the agreement. Indeed, John performed occasional inspections for Beacon nearly a year after parting ways with HouseMaster. Because HouseMaster became Beacon but "[e]verything else in terms of the operation of the [home inspection] business stayed the same," the Court finds Michelle, Woody, and King acted in concert with and are affiliates of John's former franchise business.[2] (Michelle Dep. Tr. Rough 27:1-8, 36:22-25.) Thus, the preliminary injunction in the accompanying order applies with equal force to John's affiliates.

---

[2] Contrary to John's contentions, the Court disagrees that HouseMaster waived the argument that Michelle and other affiliates should be impacted by a preliminary injunction. (*See* Proposed Order, ECF No. 2-1 (requesting the Court "enjoin[] Defendant John Burke and his agents, servants, employees, spouses, children and all others in active concert. . . .").)

The Court therefore must decide what reasonable covenants may be enforced against John and his affiliates. *ADP, LLC v. Rafferty*, 923 F.3d 113, 121 (3d Cir. 2019) (under New Jersey law, courts can blue pencil restrictive covenants to protect a business's trade secrets, customer relationships, and confidential information while striking "devastating effects" on the other party (quoting *Solari Indus., Inc. v. Malady*, 264 A.2d 53, 61 (N.J. 1970)). The Court has reviewed the terms of the Franchise Agreement and the enjoinment HouseMaster seeks. The Court orders as follows:

- **Time limit**. The Court will grant a preliminary injunction that prohibits John and his agents, servants, employees, spouses, children, and all others acting in active concert or participating with him from violating the terms of his noncompete covenant for a period of 18 months.

- **Radius**. The Court enjoins John and his agents, servants, employees, spouses, children, and all others acting in active concert or participating with him from operating a competing business within a radius of twenty-five (25) miles from his formerly approved territory.

- **Restrictions**. The Court enjoins John and his agents, servants, employees, spouses, children, and all others acting in active concert or participating with him from soliciting or performing services for prior customers for which he performed inspection services while he operated a HouseMaster franchise or current customers for any other HouseMaster franchise. These restrictions apply equally to Michelle, Woody, and King. Moreover, except for Michelle, Woody, and King, the Court enjoins John and his agents, servants, employees, spouses, children, and all others acting in active concert or participating with him from employing or seeking to employ any person employed by HouseMaster or any other HouseMaster franchisee.

- **Previous HouseMaster Telephone Numbers**. Pursuant to the terms of the Franchise Agreement (Franchise Agreement § XI(D)), the Court orders John to assign or otherwise disassociate with his former telephone numbers utilized while the Burkes operated a HouseMaster franchise business; to wit, the phone numbers (757) 577-2848, (757) 822-4839, and (757) 549-3433.

- **Proprietary Material**. The Court enjoins John and his agents, servants, employees, spouses, children, and all others acting in active concert or participating with him from using or disclosing HouseMaster's confidential or proprietary franchise or customer information in any manner for any reason, so long as that information was

obtained using HouseMaster's systems or accounts. All such information must be returned to HouseMaster or destroyed.

In addition, the Court finds it appropriate to toll the 18-month restrictive period for the duration of John's undisputed violation of his Franchise Agreement covenants. The Franchise Agreement expressly provides that the restrictive period shall extend beyond 18 months should the Franchisee owner violate the provisions. (Franchise Agreement § XII(C).) To ensure the franchisor receives "the full benefit of its bargain," courts often toll the restrictive periods while a party remains in clear violation of the agreement. *E.g.*, *ADP, LLC v. Pittman*, No. 19-16237, 2019 WL 5304148, at *7 (D.N.J. Oct. 18, 2019). By John's own admissions, he continued performing inspections for Beacon until February 2022. (Burke Dep. Tr. 134:5-7.) Thus, the Court tolls the 18-month restrictive period until February 1, 2022.

## IV. <u>CONCLUSION</u>

For the above reasons, the Court finds that HouseMaster made the requisite showing that it is entitled to a preliminary injunction. The Court will issue an order consistent with this Memorandum Opinion.

MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE